UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LORITA GERRITSON,

        Plaintiff,

    v.

ANDREW SAUL,

        Defendant.

Case No. 18-cv-03492-JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, REVERSING THE DECISION OF THE COMMISSIONER AND REMANDING FOR FURTHER PROCEEDINGS**

Re: Dkt. Nos. 14, 15

## I.    INTRODUCTION

Plaintiff Lorita Gerritson applied for disability insurance and supplemental security income benefits under Titles II and XVI of the Social Security Act, claiming that as of January 31, 2014 she was unable to work due to chronic pelvic pain, fibromyalgia, high blood pressure and depression. She seeks review of the final decision of Defendant Andrew Saul, Commissioner of the Social Security Administration (the "Commissioner"), denying her applications. For the reasons stated below, the Court GRANTS Gerritson's Motion for Summary Judgement, DENIES the Commissioner's motion for summary judgement, REVERSES the decision of the Commissioner, and REMANDS the case to the Social Security Administration for further proceedings.[1]

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

## II.    BACKGROUND

### A.    Factual Background

#### 1.    Educational and Employment Background

Gerritson was born on September 4, 1969.  Administrative Record ("AR") at 379.  She received a high school equivalency certification ("GED") in 2005, which is the highest grade of school she has completed.  *Id.* at 392.  She became a Certified Nursing Assistant in 1998.  *Id.* Between 2001 and 2014, she worked as a Caregiver at San Jose Health and Wellness Center.  *Id.* at 381.  Gerritson also worked part-time at Petsmart between January of 2007 and January of 2008 and at Kohls in November and December of 2009.  *Id.* at 381.

#### 2.    Medical Background

On January 27, 2014, Gerritson went to the emergency department of the Santa Clara Valley Medical Center complaining of pelvic pain and constipation, which she had been experiencing for about a week.  *Id.*  at 484.  She reported that she had tried taking Tylenol but that it did not help.  *Id.*  She was seen by Anthony Montefusco, M.D.  *Id.*  Dr. Montefusco noted that Gerritson had had tubal ligation seventeen years prior.  *Id.*  He noted that an ultrasound showed that Gerritson had bilateral adnexal cysts with hydrosalpinx.  *Id.* at 488.  Dr. Montefusco also found "focal prominence of the endometrial stripe with hyperechoic lesion which may represent a submucosal polyp or submucosal fibroid," *id.* at 487, and that endometrial cancer as a cause of the latter condition could not be ruled out.  *Id.*  Dr. Montefusco prescribed Naproxen 500 mg. twice a day for pain, Tylenol with Codeine #3 for severe pain, Colace, Reglan, Zofran, and Metamucil. *Id.* at 488.  Dr. Montefusco also referred Gerritson for a follow up with the gynecology clinic.  *Id.*

On February 11, 2014, Gerritson was seen at the emergency department at the Regional Medical Center of San Jose, again complaining of abdominal pain.  *Id.* at 461.  Richard S. Chen, M.D., treated Gerritson.  *Id.*  Gerritson reported that the pain was "moderate" but that it had been "constant" for approximately two weeks and that while the pain had not worsened, it also was "[n]ot relieved by anything." *Id.* at 463.  Dr. Chen reported that Gerritson's "examination was notable for a well appearing female in no acute distress."  *Id.* at 465.  He found that Gerritson had mild tenderness to palpitation in her lower right pelvic area.  *Id.*  He also noted that Gerritson

might have a urinary tract infection ("UTI") and referred her to Dr. Gul A. Zikria, a specialist in obstetrics and gynecology. *Id.* Dr. Chen administered morphine to alleviate Gerritson's pain and noted improvement in her condition. *Id.* at 469. He recommended she take acetaminophen to manage the pain and counseled against strenuous activity and work for the rest of the day. *Id.* at 466. He also prescribed Cephalexin to treat Gerritson's possible UTI. *Id.*

On March 3, 2014, Gerritson was seen at the Santa Clara Valley Medical Center Gynecology Clinic for a follow-up on the January 27, 2014 emergency department visit. *Id.* at 489. Kathleen Fujino, M.D. treated Gerritson. *Id.* at 488. Dr. Fujino noted that in 2012, Gerritson had been treated for an H. Pylori infection (bacterial infection of the stomach) which caused unexplained weight loss. *Id.* at 489. Gerritson reported pain in both lower quadrants, with worse pain in the right lower quadrant, and believed it had begun a year or two after she received treatment for her H. Pylori infection. *Id.* Gerritson reported that the pain had been bearable for a long time, but at times she experienced "sharp 'cutting' pain" that was "painful enough she would have to lean over." *Id.* Dr. Fujino found that Gerritson experienced tenderness in her right upper quadrant, left mid quadrant, and both lower quadrants as well as over her bladder and pelvic floor. *Id.* at 492. She noted that the etiology of Gerritson's chronic pain was "unclear." *Id.* She determined that Dr. Montefusco's finding of hydrosalpinx was likely only incidental given that Gerritson had tubal litigation seventeen years prior and had only begun experiencing pain recently. *Id.* Additionally, the hydrosalpinx would not explain Gerritson's pain in the upper quadrants or tenderness over the bladder. *Id.* Dr. Fujino could not rule out interstitial cystitis or medullary sponge kidney as potential causes, though she did determine endometriosis likely was not the cause of Gerritson's pain. *Id.* at 493. Dr. Fujino conducted a routine gynecological examination and ordered a mammogram screening. *Id.*

On March 6, 2014, Gerritson was seen at the Santa Clara Valley Medical Center for her chronic abdominal pain. *Id.* at 512. Constance Lo, M.D., treated Gerritson, with the assistance of medical resident Christopher Rodriguez. *Id.* at 512, 517. Gerritson reported constipation and pain in her right lower quadrant, right abdomen, right posterior hip, and right flank. *Id.* at 512. The pain was not associated with bowel movements, menstruation, or intercourse. *Id.* Gerritson

3

reported having abdominal pain since at least 2011. *Id.* Gerritson had been taking ibuprofen between six and eight times a day. *Id.* Drs. Rodriguez and Lo found Gerritson had "hypertension to 150s to 170s" and believed the hypertension was "[l]ikely secondary to chronic NSAID use." *Id.* at 517. They prescribed Amlodipine 5 mg once a day and Losartan 100 mg once a day because the "NSAIDs have helped greatly with [Gerritson's] pain" and Gerritson hoped to avoid narcotics. *Id.* The doctors also prescribed two over-the-counter medications (Miralax and Senna) to treat Gerritson's constipation. *Id.* Dr. Lo noted that she "discussed goals of chronic pain treatment" with Gerritson and told her that they "might not 'cure' her pain" but could set a goal "to improve function." *Id.* The doctors recommended that Gerritson return for a follow-up appointment in a month. *Id.*

On March 20, 2014, Gerritson was treated at a clinic at Santa Clara Valley Medical Center for joint pain and depressed mood. *Id.* at 518. Gerritson saw Dr. Megan Seiko Motosue, a resident, and Dr. Lo, who personally performed the key portions of the history/physical exam. *Id.* at 518, 521. Gerritson reported pain in her bilateral shoulders, elbows, and knees. *Id.* Gerritson complained that her knee pain bothered her most and was worst "with rest and when walking up stairs." *Id.* at 518. The doctors found that Gerritson was "[t]ender in multiple target areas consistent with fibromyalgia (neck, back, lateral epicondyle of both extremities, medial fat pad of both knees)." *Id.* at 520. Dr. Lo wrote that Gerritson experienced:

> tenderness B paraspinal cervical and lumbar muscles. [Full Range of Motion] shoulders but pain in axilla with [Range of Motion]. From elbows. + ttp hand/wrist joints w/o synovitis/swelling seen. Diffuse tenderness B knees. No erythema, effusion, warmth of knees. No laxity noted with drawer, varus/valgus, no clicking with McMurrays though all maneuvers cause pain.

*Id.* at 521. Dr. Lo diagnosed "chronic arthralgia – Possible fibromyalgia." *Id.* With respect to Gerritson's depression, Dr. Lo noted that Gerritson was positive for "sleep disturbances, decreased energy and decreased appetite" and she increased Gerritson's Cymbalta dose to 40 mg a day, noting that Gerritson "started on Cymbalta 20 mg . . . a couple of weeks ago without improvement in symptoms." *Id.* at 520. Dr. Lo also increased Gerritson's prescribed dosage of Amlodipine, used to treat her hypertension. *Id.* at 520, 521. Gerritson was instructed to return for

a follow-up appointment in a month. *Id.* at 521.

On May 15, 2014, Gerritson was seen again by Dr. Lo at Santa Clara Valley Medical Center for joint pain and headache. *Id.* at 522. Jorge Armando Uribe, a medical resident, assisted Dr. Lo in the examination. *Id.* Gerritson noted that she had "stable joint pain" in her knees, ankles, shoulder, lower back, hips, and hands. *Id.* Dr. Uribe wrote:

> Today, patient woke up with occipital headache and neck pain. Initially pain was 10/10 and improved to 7/10 with ibuprofen. Patient notes that this pain has [been]persistent for approx 6 months. Patient also notes stable joint pain knees [sic.], ankles, shoulders, lower back, hips, and hands which is 5/10. Notes that joint pain is less constant since starting Cymbalta. Notes that pain is intermittent and migratory. Denies any numbness, fevers, chills, vision changes, weakness. Notes 2 [sic.] episodes of 'projectile vomiting' over last 3 [sic.] weeks associated with HA, denies any abdominal pain associated with emesis.

*Id.* The doctors conducted a physical examination and found that Gerritson had "[d]ifficulty with lateral head rotation to right 2/2 pain, no nuchal rigidity." *Id.* at 525. They also found that Gerritson experienced mild tenderness to palpitations in her periumbilical region, posterior occipital muscles bilaterally and posterior neck muscles, deltoid muscles, PIPs bilaterally, and knees but "no joint swelling or erythema of MCPs, PIPs, or DIPs" and "no joint effusions" in Gerritson's knees. *Id.* Gerritson maintained full range of motion of her knees. *Id.* at 524. Dr. Lo increased Gerritson's Cymbalta dosage, recommended she continue taking NSAIDs in the evening, and prescribed baclofen for her neck and back pain. *Id.* She recommended that Gerritson follow up in two to three months. *Id.* at 526.

On August 15, 2014, Maria Antoniette Acenas, M.D., conducted a consultative psychiatric evaluation of Gerritson at the request of the Social Security Administration. *Id.* Dr. Acenas found no impairment with respect to the following abilities: to relate to others; to understand and follow simple or detailed directions; to maintain an appropriate level of concentration, pace and persistence necessary to perform one or two step simple or complex tasks; to tolerate the usual stress and pressures associated with day to day work activities; to manage changes in a routine work situation; to manage her funds; or, to use basic mathematical skills. *Id.* at 522–23. Dr. Acenas noted that Gerritson had not sought "any form of psychiatric treatment." *Id.* at 531.

On September 30, 2014, Gerritson presented at the Santa Clara Valley Medical Center for

saline infusion sonography due to abnormal uterine bleeding. *Id.* at 534. Dr. Fujino had referred Gerritson. *Id.* Dr. Maiuyen Thi Nguyen, a resident, and Dr. Lindsay Kolderup treated Gerritson. *Id.* The images revealed a single endometrial polyp. *Id.* at 535. Dr. Kolderup noted that she would discuss a treatment plan with Dr. Fujino, "likely hysterectomy." *Id.*

On October 1, 2014, Gerritson went to the emergency department at the Regional Medical Center of San Jose complaining of severe left hip pain. *Id.* at 766. Mabel Gomez, a certified physician's assistant, and Ha Vu, M.D., treated Gerritson. *Id.* at 773. Gerritson was diagnosed with arthralgia. *Id.* at 909. Gerritson was instructed to continue taking her regular medications and to take ibuprofen; she was also given a prescription for hydrocodone – acetaminophen (Norco). *Id.* at 910-911. She was told to follow up with Dr. Lo. *Id.* at 910.

On October 9, 2014, Gerritson was seen by Dr. Lo and medical resident Cindy Ung at the Santa Clara Valley Medical Center. *Id.* at 537. She reported "bilateral hip pain and 3 months of episodic nausea, diaphoresis, palpitations and lightheadedness." *Id.* She reported that the NSAID she had been taking (diclofenac) did not alleviate her pain but that the Norco alleviated the pain. *Id.* She also reported that although the pain in her left hip had improved, she was now experiencing hip pain in her right hip. *Id.* The doctors found that Gerritson had trochanteric bursa tenderness on her right hip, but a normal range of motion and full strength in both hips. *Id.* at 539. They opined that Gerritson's trochanteric bursitis in her right hip was "likely due to lower back pain causing" a change in her gait. *Id.* at 540–41. The doctors prescribed cyclobenzaprine (Flexeril) to treat Gerritson's muscle spasms and ordered her to continue taking NSAIDs and to start back exercises to treat her trochanteric bursitis. *Id.* at 540.

On November 10, 2014, Gerritson presented at the Santa Clara Valley Medical Center for a Pre-Operative Anesthesia Evaluation. *Id.* at 578. Kwai Ying Chung, a nurse practitioner, conducted the evaluation. *Id.* Gerritson had a surgery scheduled to remove her endometrial polyp on November 19, 2014. *Id.*

On November 13, 2014, Gerritson was seen at the Santa Clara Valley Medical Center for a follow-up pre-operative visit. *Id.* at 584. Dr. Alexander Le Nguyen, a resident, and Dr. Lo treated Gerritson. *Id.* at 592. In reviewing Gerritson's medical history, Dr. Nguyen noted that Gerritson

had previously received injections to manage her right lower quadrant pain on the following dates: September 9, 2014; September 23, 2014; October 6, 2014; and October 22, 2014. *Id.* at 591–92. Gerritson reported that the injections reduced her pain, but that her hip pain was exacerbated whenever she walked a lot. *Id.* at 592. Dr. Nguyen and Dr. Lo referred Gerritson to a physical therapist and cleared her for surgery the following week. *Id.*

On November 19, 2014, Gerritson presented at Santa Clara Valley Medical Center for surgery to remove her endometrial polyp. *Id.* at 593. Dr. Monica Jeanne Berletti, a resident, and Dr. Fujino examined Gerritson prior to the procedure. *Id.* Dr. Nadya Kondrashov and Dr. Fujino then conducted the following procedures: laparoscopic bilateral salpingectomies; hysteroscopic polypectomy; and, uterine curettage. *Id.* at 631–33.

On January 27, 2015, Gerritson was seen by Dr. Lo at the Santa Clara Valley Medical Center for fibromyalgia. *Id.* at 638. Gerritson reported feeling pain "all over," mostly in her back and right hip but also in left shoulder, left elbow, feet, toes, wrists, finger joints, and tailbone. *Id.* Gerritson reported that it was hard to walk and that walking intensified her pain. *Id.* Gerritson also reported that sitting intensified her pain. *Id.* Dr. Lo noted that in addition to the four injections listed above, Gerritson received another injection to manage her pain on December 4, 2014. *Id.* at 640. Dr. Lo also noted that Gerritson had been prescribed Gabapentin for pain on December 30, 2014. *Id.* Gerritson reported no change in her pain levels since starting Gabapentin. *Id.* at 639. Dr. Lo found that Gerritson had tenderness to palpitation in her lower back and right trochanteric bursa. *Id.* at 642. Dr. Lo also noted that Gerritson had a painful range of motion in her lower back. *Id.* Dr. Lo discussed options with respect to changing Gerritson's daily medication for pain management and ultimately increased Gerritson's Gabapentin dosage from 300 mg. to 600 mg. a day. *Id.* at 639, 641. She renewed Gerritson's Norco prescription, prescribing two 325 mg. tablets every six hours as needed for pain. *Id.* at 645. Dr. Lo "[d]iscussed that no med will completely take away pain." *Id.* at 643. Dr. Lo also referred Gerritson to physical therapy and recommended that she return for a follow-up appoint in four weeks. *Id.*

On February 26, 2015, Gerritson returned to Santa Clara Valley Medical Center for a

follow-up appointment with Dr. Lo regarding her fibromyalgia. *Id.* at 643. Dr. Lo noted that there were no physical therapy appointments available in the next two months. *Id.* She also wrote that the increase in Gerritson's Gabapentin "was not working" and that Gerritson reported "days with really bad pain," that it was "hard to do the things she needs to do," that "[j]ust moving chairs hurts elbows and knees," and "triggering of all fingers – if [she] grabs a bag of garbage, her fingers all get stuck." *Id.* Dr. Lo found that Gerritson had tenderness to palpitation in her lateral epicondyles, elbow joints, dorsal wrists, fingers, and right trochanteric bursa. *Id.* at 646. Dr. Lo determined that Gerritson had a full range of motion in her elbows and hips and no synovitis in any of the tested areas. *Id.* Gerrison did have "resisted wrist movements." *Id.* Dr. Lo ordered that Gerritson stop taking Gabapentin, replacing it with pregabalin (Lyrica). *Id*. at 646. She continued to prescribe Norco (hydrocodone- acetaminophen), two tablets by mouth every six hours as needed for pain. *Id.* at 646. Gerritson also received another injection to her right trochanteric bursa to manage her pain. *Id.* Dr. Lo recommended that Gerritson return in four weeks for a follow-up appointment. *Id.*

On April 6, 2015, Gerritson was seen at the Santa Clara Valley Medical Center by Bernette Tsai, M.D., for hip pain. *Id.* at 647. Gerritson reported to Dr. Tsai that relief from her hip injection had lasted "only a few days" and that she was having pain in her right lateral hip with walking and lying on her right side. *Id*. at 647. Gerritson had not yet begun taking pregabalin because she was unsure if her insurance had approved the prescription. *Id.* Dr. Tsai found that Gerritson had tenderness to palpitation in her right lateral hip over her greater trochanter. *Id.* at 649. Dr. Tsai also noted that Gerritson's range of motion for her right hip was normal, but that Gerritson experienced "anterior groin pain with internal/external rotation of right hip." *Id.* Dr. Tsai determined that Gerritson had trochanteric bursitis, which had not responded to steroid injections. *Id.* Dr. Tsai prescribed trial lidoderm gel and placed an urgent referral with the physical therapist. *Id.*

On April 23, 2015, Gerritson received physical therapy from Franklin Cutaran, a physical therapist at Santa Clara Valley Medical Center. *Id*. at 650. Cutaran evaluated Gerritson for fifty-five minutes and spent five minutes with Gerritson on gait training and therapeutic exercises. *Id.*

8

at 654. Cutaran designed a treatment plan for Gerritson in which she would attend six physical therapy sessions over ten weeks. *Id.* at 655.

On April 24, 2015, Gerritson was seen by Gina Yukiko Fujikami, M.D., at Santa Clara Valley Medical Center. *Id.* Dr. Fujikami found that Gerritson had point tenderness in her lateral right hip with decreased abduction due to pain. *Id.* at 660. Dr. Fujikami diagnosed Gerritson with trochanteric bursitis, osteoarthritis, and fibromyalgia. *Id.* at 661. Dr. Fujikami reviewed Gerritson's treatment history, noting that both NSAIDs (ibuprofen and Naproxen) and Gabapentin were "ineffective" with respect to treatment of her fibromyalgia, and that with respect to her right hip pain, the lidocaine gel didn't help, the Lyrica made her "feel like on drugs" and that the injections offered only a few days' relief. *Id.* at 658, 661. Gerritson's pregabalin prescription was discontinued and she resumed taking Cymbalta; Dr. Fujikami also continued to prescribe Norco, writing a prescription for 60 more tablets (one month's supply). *Id.* at 662-663. Dr. Fujikami recommended that Gerritson return for follow-up in four weeks. *Id.* at 662–63.

On May 8, 2015, Gerritson went to the emergency room at the Regional Medical Center of San Jose for treatment of suprapubic pain. *Id.* at 774. Gerritson was treated by Daniel A. Nelson, M.D. *Id.* Dr. Nelson's impression was dysuria and he gave Gerritson medication for pain, with instructions that Gerritson follow up with her primary care physician. *Id.* at 777.

On May 21, 2015, Gerritson had another physical therapy session with Franklin Cutaran. *Id.* at 664–65. Cutaran performed physical therapy on Gerritson for thirty minutes. *Id.* at 665. Cutaran designed a home exercise program for Gerritson. *Id.* Cutaran noted that they had four appointments left and that Gerritson's "chronic pain" was impeding her progress. *Id.*

On May 22, 2015, Gerritson was seen at Santa Clara Valley Medical Center by Dr. Lo and medical resident Christopher Rodriguez for a follow-up appointment regarding her hip pain, dysuria with abdominal/suprapubic discomfort and depression. *Id. Id.* at 665-666. The doctors noted that Gerritson had tenderness to palpitation and trochanteric bursitis in her right hip. *Id.* at 667. The doctors also noted that Gerrritson maintained a normal range of motion and full strength in her hip, but experienced mild pain in her right hip during the range of motion test. *Id.* They reported no edema. *Id.* The doctors extended Gerritson's physical therapy so that she could have

9

more sessions and prescribed diclofenac (Voltaren) gel and Tylenol with Codeine #3. *Id.* at 670. They noted that Gerritson's memory impairment, depressed mood, irritability and frustration was "[l]ikely secondary to underlying medical conditions/chronic pain." *Id*. at 670. They increased Gerritson's Cymbalta prescription to 90 mg./day. *Id.* They noted that the previous hip injection had "failed" and that Gerritson declined to receive another injection for her hip pain. *Id.*

On May 31, 2015, Gerritson presented at the emergency department at the Regional Medical Center of San Jose, again complaining of suprapubic abdominal pain. *Id.* at 779. Patricia A. Wilson, a certified physician's assistant, examined Gerritson. *Id.* Wilson administered hydromorphone. *Id.* at 784.

On June 29, 2015, Franklin Cutaran discharged Gerritson from physical therapy due to non-compliance with the attendance policy. *Id.* at 673. Gerritson had cancelled four therapy appointments. *Id.* at 672.

On January 3, 2016, Gerritson presented at the emergency room at the Regional Medical Center of San Jose for chest pain. *Id.* at 787. Arieh Z. Kestler, M.D., treated Gerritson. *Id.* Dr. Kestler could not determine an etiology for Gerritson's chest pain. *Id.* at 791. Dr. Kestler recommended that Gerritson follow up with her private medical doctor. *Id.*

On January 12, 2016, Gerritson was seen by Dr. Lo at Santa Clara Valley Medical Center for knee pain and hip pain. *Id.* at 673. Dr. Lo noted that Gerritson felt "[l]ots of pain all over, getting worse overall." *Id.* Gerritson reported pain in her right knee, hips, back, hand, and bladder. *Id.* at 673, 674. Gerritson told Dr. Lo that she could not stand too long and could not cook because her hands hurt. *Id.* She said that she needed more help with housework because of the pain. *Id.* at 673. She said walking caused her more pain in her hips, back, and knee. *Id.* Gerritson also reported that she ceased going to physical therapy because her pain "hurt more when she got out." *Id.* Dr. Lo did not recommend that Gerritson return to physical therapy. Dr. Lo noted that Gerritson had tender spots in several parts of her body, including her trochanter bursa, but Gerritson retained full range of motion in her elbows, wrists, fingers, hips, and knees. *Id.* at 676. Dr. Lo noted that Gerritson had "tried and failed Baclofen, Gabapentin, Lyrica, NSAIDs, and now Flexeril and T#3." *Id.* at 677. Dr. Lo recommended that Gerritson continue

taking Cymbalta and prescribed amitriptyline (Elavil) and Norco.  *Id.*  Dr. Lo also referred Gerritson to a urology clinic and a sleep clinic.  *Id.*  Dr. Lo instructed Gerritson to return in three months for a follow-up appointment.  *Id.*

On January 22, 2016, Gerritson presented at Santa Clara Valley Medical Center with cold symptoms.  *Id.* at 677.  Dr. Michael Anthony Cruz, a resident, and Dr. Lo treated Gerritson.  *Id.* at 677, 680.  The doctors diagnosed Gerritson with acute nasopharyngitis and prescribed benzonatate and codeine-guaifenesin.  *Id.* at 680.  The doctors also recommended that Gerritson drink plenty of fluids and use a humidifier at night.  *Id.*

On January 23, 2016, Gerritson was admitted to the emergency department at the Regional Medical Center of San Jose with the following symptoms: cough, fever, nasal congestion, and upper respiratory infection.  *Id.* at 795.  Alan Chye, a certified physician's assistant, treated Gerritson.  *Id.*  Chye diagnosed Gerritson with acute sinusitis and prescribed augmentin.  *Id.* at 797.  Chye instructed Gerritson to return if her symptoms worsened.  *Id.*

On February 10, 2016, Gerritson presented at Santa Clara Valley Medical Center for a urology appointment to address Gerritson's bladder pain.  *Id.*  Laurie Granberry, a nurse practitioner, examined Gerritson.  *Id.*  Granberry conducted several tests and referred Gerritson to both the urology clinic and a radiologist.  *Id.* at 685.

On February 29, 2016, Gerritson presented at the emergency department at the Regional Medical Center of San Jose with left ankle pain.  *Id.* at 799.  Alan Chye, a certified physician's assistant, treated Gerritson.  *Id.*  Chye diagnosed Gerritson with tendonitis.  *Id.* at 801.  Gerritson was splinted, placed on pain and NSAID medication, instructed on ice packs, and referred to orthopedics.  *Id.* at 801, 802.

On March 22, 2016, Gerritson presented at VMC Sleep Clinic for evaluation of possible obstructive sleep apnea.  *Id.* at 686.  Gerritson was evaluated by Yuyan Han, a nurse practitioner, and Juanita A. Isais, a medical assistant.  *Id.* at 690.  Han ordered an overnight polysomnogram pending approval "from utilization department or insurance."  *Id.*

On March 23, 2016, Gerritson returned to the Santa Clara Valley Medical Center for a follow-up urology appointment.  *Id.* at 692.  Laurie Granberry, a nurse practitioner, treated

Gerritson. *Id.* The examination revealed that Gerritson had interstitial cystitis and bladder pain. *Id.* at 695. Granberry prescribed pentosan polysulfate, phenazopyridine, and amitriptyline to treat both conditions. *Id.*

On July 21, 2016, Gerritson was seen by Dr. Lo at the Santa Clara Valley Medical Center for edema. *Id.* at 723. *Id.* Gerritson reported that she had been experiencing recurrent swelling in her legs and feet, but "none today." *Id.* Dr. Lo's found "no edema" when she conducted a physical examination but that Gerritson had some telangieactasias. *Id.* at 725. Dr. Lo determined that Gerritson had "[e]dema of both legs" with "possible venous insufficiency by history." *Id.* at 726. Dr. Lo prescribed compression stockings and ordered a future liver function test and thyroid stimulating test. *Id.* Dr. Lo ordered Gerritson to return for a follow-up appointment in about three months. *Id.* at 727.

On September 13, 2016, Gerritson presented at the emergency room at the Regional Medical Center of San Jose with right flank pain. *Id.* at 804. Dr. Daniel A. Nelson treated Gerritson. *Id.* Dr. Nelson did not determine an etiology for Gerritson's pain, but he did find signs that she had a urinary tract infection. *Id.* at 810. Dr. Nelson administered several medications intravenously to treat Gerritson's pain and urinary tract infection. *Id.* at 810, 811.

On October 17, 2016, Gerritson presented at the emergency room at the Regional Medical Center of San Jose with a headache. *Id.* at 813. Brian J. Wolter, a certified physician's assistant, treated Gerritson. *Id.* Wolter noted that his exam of Gerritson was "unremarkable." *Id.* at 818. Wolter referred Gerritson to Foothill Clinic and recommended that she see a private medical doctor. *Id.* Wolter treated Gerritson with several drugs and sent Gerritson home with Benadryl and Prednisone. *Id.*

On November 3, 2016, Gerritson was seen by Dr. Lo and medical resident Gary Lin at the Santa Clara Valley Medical Center for headaches. *Id.* at 727. Gerritson reported having intermittent severe headaches since January of 2016 which sometimes caused her to cry in pain. *Id.* The doctors diagnosed Gerritson with "possible migraines" and prescribed sumatriptan and amitriptyline. *Id.* They recommended that Gerritson return in about three months for a follow-up appointment. *Id.*

On November 29, 2016, Gerritson was seen by Yuyan Han, a nurse practitioner, at the Valley Specialty Center at the Santa Clara Valley Medical Center to follow up on the results of a polysomnography test that Gerritson received on October 11, 2016. *Id.* at 731, 733. Han determined that Gerritson "exhibited obstructive sleep apnea" and prescribed "PAP therapy" to treat Gerritson's sleep apnea. *Id.* at 731-732. On the same day, Gerritson was seen by Dr. Lo and medical resident Janhavi A. Athavale. *Id.* at 734. *Id.* Gerritson reported that the headache medications she had been taking since her November 3, 2016 appointment had reduced the severity of her chronic headaches. *Id.* Gerritson also reported that she had been constipated for over a year. *Id.* Gerritson noted that her vision and hearing had worsened. *Id.* at 735. Gerritson further noted that her chronic hip pain had worsened. *Id.* Gerritson's hip pain was typically in her right hip, but she reported that she now experienced pain in her left hip and buttocks as well. *Id.* Gerritson attributed the pain to a "flare of fibromyalgia" and noted that her medication generally controlled her pain except for during such flares. *Id.* During fibromyalgia flares, Gerritson reported experiencing "more pain than [she] could cope with" to the point where she sometimes cried. *Id.* Dr. Athavale and Dr. Lo found that Gerritson was "exquisitely tender to palpitation in [the] upper central/ subternal region" of her abdomen and "very tender to palpitation" in her bilateral lower extremities and in both of her hips. *Id.* at 737. They noted that Gerritson became "tearful on exam due to pain." *Id.* Dr. Athavale and Dr. Lo noted that Gerritson had trochanteric bursitis in both of her hips and ordered steroid injections. *Id.* at 738. They also prescribed Colace and Miralax for Gerritson's constipation and capsaicin cream to help alleviate Gerritson's fibromyalgia-related pain. *Id.* Dr. Athavale and Dr. Lo ordered Gerritson to continue taking her other medications for pain relief. *Id.* They also referred her for optometry and audiology appointments. *Id.*

On December 6, 2016 Gerritson presented at the Santa Clara Valley Medical Center to receive steroid injections. *Id.* at 740.

On December 13, 2016 Gerritson presented at the emergency room at the Regional Medical Center of San Jose with back pain. *Id.* at 821. Dr. Daniel E. Houseman treated Gerritson. *Id.* Dr. Houseman administered hydromorphone and ketorolac tromethamine to treat Gerritson's

pain. *Id.* at 825.

On January 31, 2017 Gerritson presented at San Jose Eyecare Optometry for an eye exam, as per the recommendation of Dr. Lo and Dr. Athavale. *Id.* at 932. Dr. Tracy T. Le treated Gerritson. *Id.* at 933. Dr. Le diagnosed Gerritson with bilateral myopia and recommended she return to "valley med ophthalmology clinic for further work up." *Id.* at 932. Dr. Le also gave Gerritson a "New Spec Rx." *Id.*

### B. Legal Background: Five-Step Analysis for Determining Physical Disability

Disability insurance benefits are available under the Social Security Act (the "Act") when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if his physical or mental impairments are of such severity that he is not only unable to do his previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Act. *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Id.* "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Id.*

At step one, the Administrative Law Judge ("ALJ") considers whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in such activity, the ALJ determines that the claimant is not disabled, and the evaluation process stops. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ continues to step two. *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment" or combination of such impairments that meets the regulations'

twelve-month durational requirement.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii).  An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment, disability benefits are denied.  20 C.F.R. § 404.1520(a)(4)(ii).  If the ALJ determines that one or more impairments are severe, the ALJ proceeds to the next step.  *See id.*

At step three, the ALJ compares the medical severity of the claimant's impairments to a list of impairments that the Commissioner has determined are disabling ("Listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If one or a combination of the claimant's impairments meets or equals the severity of a listed impairment, the claimant is disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the analysis continues.  *See id.*

At step four, the ALJ must assess the claimant's Residual Function Capacity ("RFC").  An RFC is "the most [a claimant] can still do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's] case record."  20 C.F.R. § 404.1545(a)(1).  The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform his past relevant work.  20 C.F.R. § 404.1520(a)(4).  Past relevant work is "work that [a claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it."  20 C.F.R. § 404.1560(b)(1).  If the claimant is able to perform his past relevant work, then the ALJ finds that he is not disabled.  If the claimant is unable to perform his past relevant work, then the ALJ proceeds to step five.

At step five, the Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite [the claimant's] identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the Commissioner meets this burden, the claimant is not disabled.  *See* 20 C.F.R. § 404.1520(f).  Conversely, the claimant is disabled and entitled to benefits if there are not a significant number of jobs available in the national economy that the claimant can perform.  *Id.*

### C.    Procedural Background

#### 1.    Administrative Hearing

On March 23, 2017 an administrative hearing was held.  Administrative Law Judge ("ALJ") Dana McDonald presided.  The ALJ began his examination of Gerritson by asking her about her recent move from Desert Springs, CA to San Jose, CA.  AR at 37.  Gerritson explained that she had lived with her sister in Desert Springs for a little less than a year in 2015 because her sister was "trying to help" Gerritson, but that she moved back to San Jose because it was "too much" for her sister.  *Id.*   Next, Gerritson's counsel, John Robertson, asked Gerritson to explain what conditions she had that kept her from working.  *Id.* at 38.  Gerritson testified that she suffered from fibromyalgia, migraines, sleep apnea, hip pain, pelvic pain, asthma, and depression.  *Id.* at 38–40.  She testified that her sleep apnea prevented her from sleeping more than three hours a night.  *Id.* at 38.  She described her hip pain as "excruciating" such that she could "barely walk." *Id.*  She stated that when she walked, she felt a "throbbing" pain extending "towards the top part of [her] hip," which eventually led to pain in both her knees and lower back.  *Id.*  She testified that she could only "sit down for maybe 20 minutes before having to get up again because it causes pain." *Id.*  She testified that she would then "have to sit down again because that causes pain." *Id.*  Gerritson testified that her depression also kept her from doing "the things [she] used to be able to do." *Id.* at 39.

Gerritson described her fibromyalgia as causing "flare ups" four or five times a month which felt like "ten times the regular pain that [she] live[s] with all the time." *Id.* at 39, 40.  She testified that her flare ups last up to three or four days and that during flare ups she can do nothing "but lay there and cry." *Id.* at 39.  She testified that she presented at the emergency room during her most recent flare-up.  *Id.* at 40.  She also testified that her fibromyalgia causes pain in her fingers, wrists, elbows, and "anything that bends." *Id.*  She said that when she bends her fingers, they "tend to curl up really tight"  and that when she tries to get them open the pain "shoots up to the wrists and doesn't go away for at least an hour"; as a result she cannot "cut a hot dog with [her] fingers and can hold a coffee cup only with her hands open on each side of the cup but not by holding the handle.  *Id*. at 40-41.  She testified that she cannot lift a gallon of milk because it

16

causes too much pain.  *Id.* at 41.    She testified that she also has trouble concentrating and cannot walk very far because of her pain.  *Id.* at 44, 45.  Gerritson further testified that the pain causes her difficulty with her balance and that she had fallen into the bushes near her home three times as a result.  *Id.* at 45.  She testified that she had experienced swelling in her feet and legs "maybe four times a month."  *Id.* at 47.

Gerritson's attorney then asked her a series of questions about her daily activities.  *Id.* at 48.  She testified that she was not able to cook, do chores, grocery shop, or attend church.  *Id.* at 48–50.  Gerritson stated that she did, however, do "the sitting exercises" and walk slowly around her house.  *Id.* at 48.

The ALJ then asked Gerritson several questions about her residence, how she travelled from Desert Springs to San Jose, and how she travelled to the hearing.  *Id.* at 51–52.  Gerritson testified that she could not drive and that her "son's father" had driven her on both occasions.  *Id.*  She testified that she had been living with her son's father since returning from Desert Springs.  *Id.*  The ALJ then asked Gerritson why she stopped working.  *Id.* at 52.  Gerritson testified that her chronic pain had interfered with her ability to work.  *Id.*  The ALJ asked about Gerritson's treatment history.  *Id.* at 54.  Gerritson testified that Dr. Lo was her primary care physician and that she typically received medical treatment at the Moorpark Clinic at the Santa Clara County Medical Center.  *Id.*  She stated that multiple specialists had also treated her at the Santa Clara County Medical Center.  *Id.* at 55–56.  The ALJ asked about Gerritson's CPAP machine.  *Id.*  Gerritson reported that she typically "used the machine as long as she could" but would sometimes have to take it off at night.  *Id.*

The ALJ next examined Susan Allison, a vocational expert ("VE").  *Id.* at 56.  The VE described Gerritson's past relevant work, testifying that Gerritson had worked as a certified nursing assistant, DOT 355.674-014, medium work, semi-skilled, SVP 4 and as a kennel worker, DOT 410.674-010, medium work, semi-skilled, SVP 4.  *Id.* at 59.  The ALJ then asked the following hypothetical of the VE:

> for purposes of this hypothetical, assume that we have an individual who [is] of the same age, education and work experience as the claimant in this case, who has

inability to read, write and work with numbers that would be commensurate with her educational attainment. Further assume that the hypothetical claimant has the physical capacity to occasionally lift 20 pounds, frequently ten, stand and walk about six hours in an eight hour work day. Have an unlimited ability to push and pull other than for lifting and carrying as [the ALJ] described. There would also be environmental limitations associated with the history of asthma that is indicated in the record. Such that the individual would need to avoid concentrated exposure to fumes, odors, dust, gasses and poor ventilation. I want you to assume that the mental impairment has been judged to be non-severe so there would not be limitations related to that aspect of what you've heard here today. And [I] ask you, I would take it that with that RFC, an individual would not be able to return to past medium work. Is that correct?

*Id.* at 60. The VE answered in the affirmative.

The ALJ then asked if the VE could "identify other work that would be commensurate with these limitations." *Id.* The VE listed the following available positions:

There would be cashier II, DOT 211.462–010, light work, unskilled, SVP: 2. Nationally, approximately 1.2 million positions. A variety of assembler work, such as assembler plastic hospital parts, DOT 712.687–010, light, unskilled, SVP: 2. Nationally, approximately 230,000 positions. And cleaner, DOT 323.687–014, light, unskilled, SVP 2. Nationally, approximately 387,000 positions.

*Id.* at 61.

Gerritson's attorney then posed two hypotheticals to the VE. First, Robertson asked if the hypothetical person described by the ALJ could maintain employment if that person "were to miss three days per month on a regular basis." *Id.* at 61. The VE answered in the negative. *Id.* Robertson then asked if the hypothetical person could maintain employment if the person were to require two additional breaks of fifteen minutes each "in addition to those regularly scheduled breaks." *Id* at 61, 62. The VE answered in the negative. *Id.* at 62.

### 2. The ALJ's Decision

The ALJ found that "[t]he claimant has met the insured status requirements of the Social Security Act at all times material" to his decision. *Id.* at 17. The ALJ then applied the five-part evaluation process to determine whether a claimant is disabled under the Act. *Id.* The ALJ found that Gerritson met the first step: she had not "engaged in substantial gainful activity since January 31, 2014, the alleged onset date." *Id.*

At the second step, the ALJ identified Gerritson as having the following severe impairments: fibromyalgia; asthma; and sleep apnea. *Id.* The ALJ determined that Gerritson's hypertension and fatty liver did not limit her ability to perform basic work functions and therefore that these conditions were not severe. *Id.* The ALJ also found that Gerritson's depression did not qualify as a severe impairment. *Id.* In reaching that conclusion, the ALJ relied on the opinion of Dr. Acenas, who conducted a psychiatric consultative examination with Gerritson. *Id.* at 18. Dr. Acenas found that Gerritson's "mood was depressed and she had diminished delayed memory," but noted that Gerritson's psychiatric condition was "otherwise unremarkable." *Id.* The ALJ also noted that Gerritson had never sought mental health treatment for her depression. *Id.* The ALJ did not discuss Gerritson's trochanteric bursitis at step two.

At step three, the ALJ determined that Gerritson did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926), considering Listing 3.03 and Section 11 of the Listings. *Id.* at 19. The ALJ noted that "there is no medical listing for fibromyalgia and sleep apnea." *Id.* The ALJ stated that "[n]o treating or examining physician has recorded findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment." *Id.*

The ALJ then assessed Gerritson's residual functional capacity. The ALJ found Gerritson to have "the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift 20 pounds occasionally and 10 pounds frequently; she can stand and walk for six hours in an eight hour workday; she can sit for six hours in an eight hour workday; she is unlimited with regard to pushing and pulling within the aforementioned limitations; and she must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation." *Id.* In reaching this determination, the ALJ found "[a]fter consideration of the evidence . . . that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are inconsistent with the residual

19

functional capacity assessment" reached by the ALJ. *Id.* at 20.

The ALJ offered several reasons in support of his RFC. First, the ALJ pointed out that the claimant "alleged extreme lifting and gripping limitations," but "[n]o treatment records showed the claimant experienced any diminished grip strength and [her] range of motion was consistently found to be full in all extremities." *Id.* Second, "the claimant alleged she experienced swelling in her lower extremities" but "medical examinations consistently did not indicate swelling or edema in any of the claimant's extremities." *Id.* Third, "the claimant received primarily emergency room treatment for her primary impairment, fibromyalgia," but she never "saw" or "was referred to a fibromyalgia specialist, such as a neurologist for more in-depth treatment regarding this impairment." *Id.* at 21, 23. The ALJ interpreted this as demonstrating "a possible unwillingness" on Gerritson's part "to do what is necessary to improve her condition" and as "an indication that his [sic] symptoms were not as severe as she reported." *Id.* The ALJ repeatedly characterized Gerritson's treatment for her fibromyalgia, sleep apnea, and asthma as "conservative" and suggested that "[t]he lack of more aggressive treatment or even a referral to a fibromyalgia specialist suggests the claimant's symptoms and limitations were not as severe as she alleged." *Id.* He stated, "there was no evidence of consistent findings of fibromyalgia symptoms, such as positive tender points, skin rashes, or hair loss that showed her fibromyalgia symptoms were severe enough to reach a disabling level." *Id.* at 23. Finally, the ALJ relied upon the opinions of State agency physical medical consultants who reviewed the record, which the ALJ gave "great weight." *Id.* at 23.

In light of this RFC, the ALJ found that "the claimant is unable to perform any past relevant work." *Id.*

At step five, the ALJ determined that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* at 24. The ALJ cited the VE's testimony at the administrative hearing in support of his conclusion that Gerritson could work as a "Cashier II, DOT 211.462-010," "Assembler, plastic hospital parts, DOT 712.687-010," or "Cleaner, DOT 323.687-014." *Id.* at 23, 24. Thus, the ALJ concluded that "[t]he claimant has not been under a

disability, as defined in the Social Security Act, from January 31, 2014, through the date of [the ALJ's] decision." *Id.* at 24.

### 3. Contentions of the Parties on Summary Judgment

#### A. Plaintiff's Motion for Summary Judgement

Gerritson filed this action seeking review of the ALJ's decision and now moves for summary judgement based on two alleged errors: (1) the ALJ erred in step two of the sequential evaluation by failing to consider whether Gerritson's trochanteric bursitis was a severe impairment and (2) the ALJ erred in declining to credit Gerritson's testimony as to the severity of her symptoms. *See* Pl.'s Mot. at 11–15. With respect to the first error, Gerritson contends that the medical record establishes that she "suffers from hip bursitis with associated severe pain," but the ALJ did not explicitly consider Gerritson's hip bursitis at step two of the sequential evaluation. *Id.* at 11–12. Gerritson argues that this was not a harmless error because the ALJ did not consider "the potential pain that the combination" of fibromyalgia and hip bursitis could cause in determining Gerritson's RFC. *Id.* at 12. Additionally, Gerritson alleges that "her fibromyalgia pain had flareups while her hip pain was assessed as persistent." *Id.* With respect to the second alleged error, Gerritson argues that the ALJ failed to provide "specific, clear, and convincing reasons" for rejecting her testimony regarding the severity of her symptoms. *Id.* at 13.

#### B. Defendant's Motion for Summary Judgement

The Commissioner filed a cross-motion for summary judgement and opposed Plaintiff's motion for summary judgement. *See* Def.'s Cross-Mot. & Opp. at 1. The Commissioner argues that the ALJ's failure to consider Gerritson's trochanteric bursitis at step two is harmless because the ALJ considered Gerritson's trochanteric bursitis when assessing Gerritson's RFC. *Id.* at 3. The Commissioner argues further that the ALJ properly weighed Gerritson's testimony regarding the severity of her symptoms because Gerritson only sought "conservative" medical treatment and some of her alleged symptoms were not substantiated by objective medical evidence. *Id.* at 4–7.

# III. ANALYSIS

## A. Legal Standard Under 42 U.S.C. §§ 405(g) and 1383(c)(3)

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be based on the record as a whole. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison v. Colvin,* 759 F.3d 995, 1019–21 (9th Cir. 2014).

## B. Legal Standards Governing Disability Determinations Based on Fibromyalgia

As the ALJ's RFC is based, in large part, on his evaluation of Gerritson's limitations related to her fibromyalgia, the guidance that has been offered by the Ninth Circuit on disability determinations involving fibromyalgia is instructive. In *Revels v. Berryhill*, the Ninth Circuit offered the following explanation of "what fibromyalgia is, how it is properly diagnosed, and what its symptoms are":

> Fibromyalgia is a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue. Typical symptoms include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue. What is unusual about the disease is that those suffering from it have muscle strength, sensory functions, and reflexes that are normal. Their joints appear normal, and further musculoskeletal examination indicates no objective joint swelling. Indeed, there is an absence of symptoms that a lay person may ordinarily associate with joint and muscle pain. The condition is diagnosed entirely on the basis of the patients' reports of pain and other symptoms. There are no laboratory tests to confirm the diagnosis.

874 F.3d 648, 656 (9th Cir. 2017) (internal citations and quotations omitted); *see also Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004) (holding that ALJ had improperly discredited pain testimony of claimant related to her fibromyalgia).

The *Revels* court explained that "[f]or a long time, fibromyalgia was poorly understood within much of the medical community" and that "there used to be considerable skepticism that fibromyalgia was a real disease." *Id.* (internal citations and quotations omitted). As a result, the Ninth Circuit was "reluctant to recognize fibromyalgia as an impairment that could render one disabled for Social Security purposes." *Id.* (citing *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001)). However, a "sea change" occurred in 2012 "when the [Social Security Administration] issued a ruling recognizing fibromyalgia as a valid 'basis for finding a disability.'" *Id.* (quoting Social Security Ruling ("SSR") 12-2P (July 25, 2012), at *2). The *Revels* court summarized SSR 12-2P as follows:

> The ruling provides two sets of criteria for diagnosing the condition, based on the 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia and the 2010 American College of Rheumatology Preliminary Diagnostic Criteria. Pursuant to the first set of criteria, a person suffers from fibromyalgia if: (1) she has widespread pain that has lasted at least three months (although the pain may fluctuate in intensity and may not always be present); (2) she has tenderness in at least eleven of eighteen specified points on her body; and (3) there is evidence that other disorders are not accounting for the pain. Pursuant to the second set of criteria, a person suffers from fibromyalgia if: (1) she has widespread pain that has lasted at least three months (although the pain may fluctuate in intensity and may not always be present); (2) she has experienced repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and (3) there is evidence that other disorders are not

accounting for the pain.

> Therefore, diagnosis of fibromyalgia does not rely on x-rays or MRIs. Further, SSR 12-2P recognizes that the symptoms of fibromyalgia wax and wane, and that a person may have bad days and good days. In light of this, the ruling warns that after a claimant has established a diagnosis of fibromyalgia, an analysis of her RFC should consider a longitudinal record whenever possible.

*Id.* at 656–57 (internal citations and quotations omitted).

## C. The ALJ's Failure to Consider Gerritson's Trochanteric Bursitis at Step Two Was Harmless Error

The purpose of the step two inquiry—requiring that the claimant demonstrate that she has an impairment or combination of impairments that is severe—is to screen out groundless claims. *Smolen v. Chater,* 80 F.3d at 1290. "An impairment or combination of impairments can be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Id.* (citations omitted). Once a claimant prevails at step two, "regardless of which condition is found to be severe, the Commissioner proceeds with the sequential evaluation, considering at each step *all* other alleged impairments and symptoms that may impact her ability to work." *Angeli v. Astrue*, No. CIV S-06-2592 (EFB), 2008 WL 802334, at *3 (E.D. Cal. Mar. 25, 2008) (citing 42 U.S.C. § 423(d)(2)(B) (emphasis added)). Thus, failure to find that an impairment is severe at step two does not necessarily constitute reversible error. *Id.* "Rather, the question is whether the ALJ properly considered the functional limitations of all medically determinable impairments at the remaining steps." *Id.* (citing *Smolen*, 80 F.3d at 1290) (holding that if one severe impairment exists, the ALJ must consider all medically determinable impairments in the subsequent steps of the sequential analysis) (citing 20 C.F.R. § 404.1523); *see also Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005) (holding that where the ALJ was alleged to have erred at step two by failing to find that one of claimant's alleged impairments was severe, it could only have prejudiced the claimant "in step three (listing impairment determination) or step five (RFC)"); *Nicholson v. Colvin*, 106 F. Supp. 3d 1190, 1195 (D. Or. 2015) ("[O]missions at step two are often harmless error if step two is decided in plaintiff's favor.").

Gerritson's treatment records indicate that Dr. Lo, Dr. Tsai, and Dr. Fujikami diagnosed Gerritson with trochanteric bursitis on five separate occasions between October 2014 and

November 2016.  AR at 540–41, 649, 661, 667, 738.  Despite the extensive evidence in the record supporting Gerritson's diagnosis of trochanteric bursitis, the ALJ failed to consider Gerritson's trochanteric bursitis at step two of the evaluation process.  *Id.* at 17–19.  Gerritson nonetheless prevailed at step two, meaning the ALJ's failure to consider her trochanteric bursitis at step two only constitutes a reversible error if the ALJ also failed to properly consider the functional limitations of her bursitis in subsequent steps of the evaluation process.  *See Burch*, 400 F.3d at 682.

The Commissioner contends that the ALJ's step-two error is harmless because the ALJ properly considered the functional limitations associated with Gerritson's trochanteric bursitis in determining Gerritson's RFC at step four.  Though the term "trochanteric bursitis" appears nowhere in the ALJ's decision, the ALJ did discuss Gerritson's hip pain in the RFC determination.  AR at 20, 22.  In particular, the ALJ noted that Gerritson "complained of pain in her right hip that limited her ability to walk."  *Id.* at 20.  Additionally, the ALJ referenced four of the five treatment notes diagnosing Gerritson's trochanteric bursitis.  *Id.* at 22.  Therefore, the Court concludes that the ALJ's failure to consider Gerritson's trochanteric bursitis at step two was harmless error.[2]

### D.  The ALJ Did not Offer Sufficient Reasons for Rejecting Gerritson's Pain Testimony

"In evaluating the credibility of a claimant's testimony regarding subjective [symptoms], an ALJ must engage in a two-step analysis."  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (citation omitted).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  *Ligenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citation omitted).  "Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."  *Id.* at 1036

---

[2] In reaching this conclusion, the Court does *not* hold that Gerritson's RFC adequately reflects the limitations associated with her trochanteric bursitis, which is exacerbated by her fibromyalgia.  As discussed below, the ALJ improperly rejected Gerritson's pain testimony when he determined Gerritson's RFC, which included her testimony about her hip pain.

United States District Court
Northern District of California

(internal quotation marks and citation omitted). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) (quoting *Lester*, 81 F.3d at 834). Further, where a claimant's impairments include fibromyalgia, the ALJ's reasons must be consistent with Social Security Ruling 12–2P, discussed above. *See Revels*, 874 F.3d at 662 ("[i]n evaluating whether a claimant's residual functional capacity renders them disabled because of fibromyalgia, the medical evidence must be construed in light of fibromyalgia's unique symptoms and diagnostic methods, as described in SSR 12-2P and *Benecke*. The failure to do so is error.").

Here, the ALJ found that the first step of the test set forth above was met but that at the second step, Gerritson had not shown that her statements about the intensity, persistence and limiting effects of her impairments were inconsistent with the ALJ's RFC. The primary reasons the ALJ gave for discrediting Gerritson's pain testimony at the second step of the analysis are: (1) the objective evidence of the medical record did not corroborate Gerritson's pain testimony; and (2) Gerritson's fibromyalgia treatment was "conservative." For the reasons stated below, the Court concludes that neither of these reasons constitutes a specific, clear and convincing reason for rejecting Gerritson's testimony regarding the limiting effects of her impairments.

### 1. Reliance on the Medical Record

As discussed above, in finding that Gerritson's limitations were not as severe as she claimed, the ALJ relied on treatment records reflecting that Gerritson had full range of motion and the absence of treatment records showing Gerritson experienced any diminished grip strength, or had any joint swelling, erythema, positive tender points, skin rashes, hair loss or edema. The ALJ's reasoning, however, is inconsistent with the guidance in SSR 12-2P and the Ninth Circuit case law and reflects a lack of understanding of the nature of fibromyalgia.

As the Ninth Circuit has held, there are "there are no laboratory tests to confirm the diagnosis" of fibromyalgia. *See Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004); *see also Trejo v. Berryhill*, No. EDCV 17-0879-JPR, 2018 WL 3602380, at *13 (C.D. Cal. July 25, 2018) ("no laboratory tests or objective findings confirm the presence or severity of fibromyalgia.") (citing *Benecke*, 379 F.3d at 590). People suffering from fibromyalgia "have 'muscle strength,

sensory functions, and [reflexes] that are normal.'" *Revels* 874 F.3d at 656 (quoting *Rollins v. Massanari*, 261 F.3d 853, 863 (9th Cir. 2001) (Ferguson, J., dissenting) (quoting Muhammad B. Yunus, *Fibromyalgia Syndrome: Blueprint for a Reliable Diagnosis*, Consultant, June 1996, at 1260)). "'Their joints appear normal, and further musculoskeletal examination indicates no objective joint swelling.'" *Id.* (quoting *Rollins*, 261 F.3d at 863 (quoting Yunus, *supra*, at 1260)). "Indeed, '[t]here is an absence of symptoms that a lay person may ordinarily associate with joint and muscle pain.'" *Id.* (quoting *Rollins*, 261 F.3d at 863). One would therefore not expect someone suffering from fibromyalgia to have reduced strength or range of motion in their joints, joint swelling, or any other objective evidence of their fibromyalgia-related pain. Rather, these examination results "are perfectly consistent with debilitating fibromyalgia." *Revels*, 874 F.3d at 666.

The Court further notes that both Drs. Lo and Tsai observed that although Gerritson had full range of motion she had pain with range of motion testing – evidence that the ALJ ignored. *See* AR 521 (Lo), 647 (Tsai), 667 (Lo). The ALJ's finding that Gerritson had no tender points is also contradicted by the record. In particular, Dr. Lo repeatedly observed in her examination notes that Gerritson had tenderness in numerous parts of her body. *See, e.g.,* AR at 520 (notes from March 20, 2014 stating that Gerritson was "[t]ender in multiple target areas consistent with fibromyalgia (neck, back, lateral epicondyle of both extremities, medial fat pad of both knees);" AR at 676 (January 12, 2016 examination notes describing "multiple tender spots at posterior B paracervical, B thoracic and lumbar paraspinal muscles, B lower SCM, B anterior chest, B lateral epic, B wrists, B troch bursas, B medial/lateral knee joint lines, B palms, in between B MCPs and at MCPs, DIPs, PIPS"); AR at 737 (November 29, 2016 examination notes noting that Gerritson was "[v]ery tender to palpitation in BLE. Both L and R hip very tender to palpitation"). Similarly, Dr. Fujikami found that Gerritson had point tenderness in her lateral right hip. *Id.* at 660.

Finally, to the extent that the ALJ apparently rejected the opinion of Dr. Lo that Gerritson was experiencing edema because Gerritson did not have edema at the appointment when Dr. Lo diagnosed her with this condition, the ALJ failed to address why that diagnosis was not consistent with Dr. Lo's findings that Gerritson showed signs of "telangiectasias" and "possible venous

insufficiency by history." AR at 725–726. Dr. Lo is Gerritson's treating physician and as such, the ALJ must offer clear and convincing reasons for rejecting her opinion. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). He did not do so, apparently relying on his own medical evaluation of her edema.

In addition to mischaracterizing the evidence in the medical record relating to Gerritson's symptoms, the ALJ's reliance on the absence of certain objective medical findings to justify his credibility finding is not consistent with the guidance in SSR 12-2P, which is not cited in his decision. As the Ninth Circuit explained in *Revels*, "[i]n evaluating whether a claimant's residual functional capacity renders them disabled because of fibromyalgia, the medical evidence must be construed in light of fibromyalgia's unique symptoms and diagnostic methods, as described in SSR 12-2P and *Benecke*." 874 F.3d at 662. The ALJ did not meet that standard here.

Gerritson presented medical records showing that over a period of years she experienced chronic pain that migrated and fluctuated, evidence that she suffered from tenderness at multiple points in her body and evidence that she experienced depression, fatigue and other symptoms typically related fibromyalgia. The record also reflects that multiple doctors were unable to find any other disorder that accounted for her symptoms. Instead of addressing this evidence within the framework of SSR 12-2P, the ALJ improperly relied on the absence of findings that courts have repeatedly recognized are not appropriate indicators of disability in the context of fibromyalgia to discount Gerritson's pain testimony. The Court finds that the ALJ's reliance on the medical record in support of his RFC is not a specific, clear and convincing reason to reject Gerritson's testimony as to the severity of her fibromyalgia-related symptoms.

## 2. Conservative Treatment

The ALJ's second reason for discounting Gerritson's pain testimony is that she "received routine conservative treatment" for her fibromyalgia symptoms. AR at 21. In particular, as discussed above, the ALJ concluded that Gerritson received "primarily emergency room treatment" for her fibromyalgia and noted that Gerritson did not seek the help of a specialist, opining that "the lack of more aggressive treatment or even a referral to a fibromyalgia specialist suggests the claimant's symptoms and limitations were not as severe as she alleged." *Id*. These

United States District Court
Northern District of California

reasons are not specific, clear and convincing reasons for rejecting Gerritson's testimony as to the severity of her symptoms.

As a preliminary matter, the ALJ's characterization of the record is simply inaccurate. As the Court's painstaking review of the medical record shows, Gerritson did not just visit the emergency room when her symptoms became severe; starting no later than March 2014, she received treatment from her primary care physician, Dr. Lo, who she saw on a regular basis at scheduled appointments that occurred approximately once a month. She also saw other doctors to whom she was referred, including at the Gynecology, Urology and Optometry Clinics, and underwent a sleep study at a sleep clinic. Indeed, Gerritson was generally compliant with the instructions of her primary care and other doctors, returning for following-up appointments when instructed, taking her medications and working with her doctors to try to find a treatment that would alleviate her pain. Gerritson received steroid injections to one or both of her hips eight separate times and was also prescribed numerous different medications to treat her fibromyalgia-related pain symptoms, including powerful opioids.

Further, as the ALJ acknowledges, Gerritson was never referred to a fibromyalgia specialist. While the ALJ suggests that the absence of a referral may have been because Gerritson's symptoms were not severe, the only evidence in the medical record that sheds any light on this question points to the opposite conclusion, namely, that Gerritson's primary care physician, Dr. Lo, did not believe that there was treatment that would "completely take away [Gerritson's] pain," as Dr. Lo told Gerritson *See* AR at 517, 643. The ALJ's suggestion that a fibromyalgia specialist would have provided more "aggressive treatment" is entirely speculative, as his assumption that Gerritson would have had access to such a specialist without a referral from her primary care physician.

"Conservative treatment is a legitimate reason for an ALJ to discredit a claimant's testimony regarding the severity of an impairment." *Trejo*, 2018 WL 3602380, at *4 (citing *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007)). However, "[a] claimant 'cannot be discredited for failing to pursue non-conservative treatment options where none exist.'" *Id.* (quoting *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010)). Moreover, "[a]ny evaluation of the

aggressiveness of a treatment regimen must take into account the condition being treated." *Revels*, 874 F.3d at 667. The Ninth Circuit has held that a course of treatment for fibromyalgia consisting of a variety of prescription medications and steroid injections is not conservative. *Id.* The District Court for the Central District of California has also noted that "'[f]ibromyalgia is treated with medications and self-care,'" *Trejo*, 2018 WL 3602380, at *15 (quoting *McNeal v. Berryhill*, No. EDCV 17-0993 SS, 2018 WL 2078810, at *7 (C.D. Cal. May 2, 2018)), "rather than 'surgery or other more radical options.'" *Id.* (quoting *Sharpe v. Colvin*, No. CV 13-01557 SS, 2013 WL 6483069, at *8 (C.D. Cal. Dec. 10, 2013)). There is substantial evidence in the record that Gerritson actively sought such treatment of her fibromyalgia symptoms. Therefore, this reason is not a specific, clear and convincing reason for the ALJ's credibility finding.

## IV.    REMEDY

Once a district court has determined that an ALJ has erred, the court must decide whether to remand for further proceedings or to remand for immediate award of benefits. *Harman v. Apfel*, 211 F.3d 1172, 1177–78 (9th Cir. 2000). Under this Circuit's "credit as true" rule, a court must credit as true evidence that was rejected and remand for an immediate award of benefits if "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id.* at 1178 (quoting *Smolen*, 80 F.3d at 1292). On the other hand, a court should remand for further proceedings when "there is a need to resolve conflicts and ambiguities." *Treichler*, 775 F.3d at 1101.

Here, the ALJ's RFC is invalid both because his factual conclusions are not supported by substantial evidence and he failed to provide legally sufficient reasons for his rejection of Gerritson's testimony regarding the severity of her symptoms. Yet even if the Court credits Gerritson's testimony, the record is insufficiently developed to determine whether she is disabled and therefore further proceedings are required. A review of the record in this case reveals a glaring absence of any medical source statements from Gerritson's treating physicians, including her primary care physician, Dr. Lo. It appears that at an early stage in the process the Social

Security Administration concluded that Gerritson had no treating physician who could provide such a statement and no request was sent to Dr.Lo for her opinions. *See* AR at 78-79. Although Gerritson later testified at the hearing that Dr. Lo was her primary care physician and the doctor who treated her fibromyalgia – and even though the ALJ confirmed at the hearing that no medical source statements had been provided – the ALJ did not request clarification from Dr. Lo regarding the severity of Gerritson's symptoms; nor did he exercise his discretion to order a consultative examination. *See* 20 C.F.R. § 404.1519a ("If we cannot get the information we need from your medical sources, we may decide to purchase a consultative examination.").

Instead of developing the record, the ALJ gave "great weight" to the opinions of state agency doctors who did not examine Gerritson and who last reviewed Gerritson's medical records in late 2014, *see* AR 23 (citing Exhibits 1a-2A and 5A-6A). With respect to the extensive medical records submitted by Gerritson for the years 2015 and 2016, the ALJ simply evaluated this evidence himself without the assistance of any medical expert, which was improper. *See Zazueta v. Colvin*, No. CV 14-1905 JC, 2014 WL 4854575, at *5 (C.D. Cal. Sept. 29, 2014) (holding that "ALJ's evaluation of medical treatment records without the assistance of a treating or examining physician does not constitute substantial evidence supporting the ALJ's residual functional capacity assessment for plaintiff or the ALJ's nondisability determination at step four" and listing cases finding that it is improper for the ALJ to "play doctor" and rely on his own medical judgment in lieu of that of a medical expert). Because the ALJ's conclusions as to the severity of Gerritson's symptoms were based on an incomplete record, this case must be remanded for further development of the record, which should include obtaining medical source statements from Gerritson's treating physicians. The Commissioner may also develop the record by ordering a report from an independent consultative examiner based on examination of Gerritson and review of her treatment records.

**V.      CONCLUSION**

For the reasons stated above, the Court GRANTS Plaintiff's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, reverses the decision of the Commissioner and remands for further proceedings.

**IT IS SO ORDERED.**


Dated:  August 12, 2019

_____
JOSEPH C. SPERO
Chief Magistrate Judge